UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| PETER MARK COCA,<br>Petitioner,<br>v.<br>NETHANJAH BREITENBACH,[1] et al.,<br>Respondents. | Case No. 2:20-cv-01494-KJD-DJA<br>ORDER |

Before the Court is Petitioner Peter Mark Coca's first amended petition for a writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 18.) Coca asserts that he received ineffective assistance of counsel prior to entering a guilty plea and at sentencing. For the reasons discussed below, the Court denies the petition and grants a certificate of appealability on Coca's claim of ineffective assistance at sentencing.

## I. Background

In late February 2011, Coca saw a text message on his wife's phone and became enraged. (ECF No. 41-1 at 142, 146–47, 168.) An altercation ensued, and Coca's wife called the police. (*Id.* at 127–30.) When police arrived, Coca was on the roof of the residence with firearms. (*Id.* at 17, 35.) Officers directed Coca to show his hands, and Coca fired several shots. (*Id.* at 36, 50–51.) Coca exchanged fire with multiple officers, including Deputy VanNatter. (*Id.* at 36, 44, 50.) Coca's son entered the scene on foot, waving his arms and yelling. (*Id.* at 26–27, 54–56.) Officers ordered Coca's son to stop, and he did not do so. (*Id.*) VanNatter then fired several shots in the direction of Coca's son. (*Id.*) The shots did not strike Coca's son, and he ran away from the scene. (*Id.*) VanNatter, who was wearing a bulletproof vest reinforced with titanium, then sustained

[1] The state corrections department's locator system indicates that Coca is confined at Lovelock Correctional Center. Nethanjah Breitenbach is the current warden for that facility. At the end of this order, the Court kindly directs the Clerk of Court to substitute Breitenbach as a Respondent for "Warden Brian Williams." *See* Fed. R. Civ. P. 25(d).

several gunshot wounds from Coca, which VanNatter survived. (*Id.* at 57–59.) Coca eventually got down from the roof, encountered officers at a nearby intersection, and fired at them. (ECF No. 19-3 at 54–58.) Coca surrendered about two days later. (*Id.* at 77–81.)

Coca faced a criminal information charging him with seven counts of attempted murder with the use of a deadly weapon, for seven different officers. (ECF No. 35-9.) Coca also faced seven alternative counts for either battery with the use of a deadly weapon resulting in substantial bodily harm (as to VanNatter) or assault with a deadly weapon upon an officer performing their duty (as to the other officers). (*Id.*)

Coca eventually entered a notice of a plea of not guilty by reason of insanity (NGRI) (ECF No. 38-4) and a supplemental disclosure stating that he intended to use Dr. Melissa Piasecki as an expert in forensic psychiatry in support of his NGRI defense at trial. (ECF No. 44-5 at 12–32.) Dr. Piasecki produced a report regarding Coca's mental state at the time of the offenses (NGRI report), including findings that Coca was experiencing mental status changes induced by prescribed testosterone treatments that he started about three months prior. (ECF No. 20-6 at 6–9.) The State filed an amended notice of intent to use expert witnesses, stating that it intended to use Dr. Hale Henson of Lake's Crossing Center as an expert regarding Coca's criminal responsibility for the offenses. (ECF No. 39-21 at 3, 32.) Dr. Henson produced a report finding that Coca was criminally responsible despite the testosterone treatments. (ECF No. 45-8 at 58–67.)

Coca then entered an agreement to plead guilty to one count of attempted murder with use of a deadly weapon (as to VanNatter) and the six alternative counts of assault with a deadly weapon upon an officer performing their duty (as to the other officers). (ECF No. 40-5.) The plea agreement spelled out the potential sentences for the guilty counts and stipulated that the parties were free to argue at the time of sentencing. (*Id.* at 5–6.) For the attempted murder count, Coca faced up to 40 years in prison—20 for the attempted murder, and 20 for the deadly-weapon enhancement that was required to be served consecutively by operation of state law. (*Id.* at 6.) For each of the six assault charges, Coca faced up to 6 years in prison. (*Id.*)

At the sentencing hearing, the State presented testimony from five officers, while Coca's counsel presented testimony from nine individuals (including Coca). (ECF No. 41-1 at 13–174.) One of those individuals was Coca's mother, who the state district court posed questions to framed around the court's stated impression that real or perceived infidelity produces heightened indignation or rage in the "Hispanic-American" or "Mexican-American community." (*Id.* at 107, 110–12.) Following the witness testimony, Coca's counsel read into the record a portion of the findings from Dr. Piasecki's NGRI report regarding the effect of testosterone on Coca's mental status at the time of the offenses. (*Id.* at 174.) The State argued for Coca to receive the maximum penalties for each count and have them run consecutively. (*Id.* at 176–82, 194–97.) Coca's counsel, again relying in part on the NGRI report, argued for Coca (who was 45 years old at the time) to receive concurrent sentences that would make him eligible for parole in his early 50s. (*Id.* at 183–94.) The court sentenced Coca to 20 to 52 years and ordered him to pay restitution of $21,384.68.[2] (ECF No. 42-28.)

Coca filed a *pro se* state postconviction petition (ECF No. 42-33), and the state district court eventually appointed Coca an attorney[3] (ECF No. 43-51) who filed a reply.[4] (ECF No. 44-5.) The court denied postconviction relief without holding an evidentiary hearing. (ECF No. 45-9.) The Nevada Court of Appeals affirmed. (ECF No. 46-24.)

Coca then filed a federal habeas petition, asserting that trial counsel was ineffective for failing to: 1A) investigate a voluntary intoxication defense; 1B) investigate an involuntary intoxication defense; 1C) adequately investigate all available defenses regardless of the available funding prior to advising Coca to plead guilty; 1D) advise Coca that he would have a viable defense-of-others claim at trial; 2) object to the state district court's expression of racial animus during sentencing; and 3) object to the excessive

[2] This sentence is reflected in an amended judgment of conviction, entered after Coca filed a direct appeal that led to the state district court holding a hearing to clarify its intended sentence. (*See* ECF No. 42-24.)

[3] These postconviction proceedings included a lengthy period of inactivity and the appointment of counsel who would later be permitted to withdraw. (*See* ECF Nos. 43-26, 43-84.)

[4] The caption of this filing reads "Supplemental Brief," but within the body of the filing, it is referred to as a "Reply Brief." (*See* ECF No. 44-5.) Postconviction counsel clarified that it was a reply (*see* ECF No. 45-2), even though the state district court referred to it as a supplemental pleading. (*See* ECF No. 45-9 at 14–15.)

restitution ordered by the court. (ECF No. 18.) Respondents moved to dismiss the petition, and Coca moved to stay this case so he could return to state court and exhaust his unexhausted claims. (ECF Nos. 28, 51.) The Court granted Coca's motion and denied Respondents' motion without prejudice. (ECF No. 58.) Coca then filed another state postconviction petition (ECF No. 65-3), the state district court denied relief (ECF No. 65-6), and the Nevada Supreme Court affirmed on procedural grounds. (ECF No. 65-46.)

After this case was reopened, Respondents moved to dismiss all but Claim 1C as unexhausted. (ECF No. 68.) The Court found the other claims to be technically exhausted but procedurally defaulted, and it deferred a decision on whether Coca could demonstrate cause and prejudice to excuse the default. (*Id.*)

## II. Standards of Review

### A. Claims Adjudicated on the Merits in State Court

Federal habeas relief for individuals confined under a state court judgment is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2254. AEDPA sets a very high bar for granting federal relief on claims adjudicated on the merits in state court. *Burt v. Titlow*, 571 U.S. 12, 18–20 (2013). Under AEDPA, such a claim cannot be the basis for federal relief unless the state court's decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Section 2254(d)(1) thus has two clauses—a "contrary to" clause and an "unreasonable application" clause. A state court's decision is "contrary to" clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result]." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (citations omitted). And an "unreasonable application" occurs where "the state court identifies the correct governing

legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* at 75 (citation omitted). A federal habeas court must find that the state court's application was "objectively unreasonable" rather than merely "incorrect or erroneous." *Id.* (citation omitted).

Under Section 2254(d)(2), a state court decision that is "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citations omitted). "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Id.* (citing 28 U.S.C. § 2254(e)(1)).

**B. Procedurally Defaulted Claims**

Review of claims adjudicated on the merits in state court, however, is ordinarily only available to petitioners who "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). "[I]f a claim is unexhausted but state procedural rules would now bar consideration of the claim, it is technically exhausted but will be deemed procedurally defaulted unless the petitioner can show cause and prejudice." *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011) (citing *Beaty v. Stewart*, 303 F.3d 975, 987 (9th Cir. 2002)). A sufficient showing of cause and prejudice does not mean that a petitioner is entitled to relief, but it does "allow[] a federal court to consider *de novo* 'the merits of a claim that otherwise would have been procedurally defaulted.'" *Atwood v. Ryan*, 870 F.3d 1033, 1060 n.22 (9th Cir. 2017) (quoting *Martinez v. Ryan*, 566 U.S. 1, 17 (2012)).

One way to demonstrate cause and prejudice is to satisfy the showings set out in *Martinez v. Ryan*. *Martinez* held that, in states with postconviction structures like Nevada, "ineffective assistance of postconviction counsel is 'cause' to forgive procedural default of an ineffective-assistance-of-trial-counsel claim." *See Shinn v. Ramirez*, 596 U.S. 366, 371 (2022) (discussing *Martinez*); *Rodney v. Filson*, 916 F.3d 1254, 1260 (9th Cir. 2019). And to show prejudice under *Martinez*, a habeas petitioner "must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one," meaning

"the claim has some merit." *Leeds v. Russell*, 75 F.4th 1009, 1022 (9th Cir. 2023) (quoting *Martinez*, 566 U.S. at 14). *Martinez*, however, "does not concern attorney errors in . . . appeals from initial-review collateral proceedings," *Martinez*, 566 U.S. at 16, as its "chief concern" is to "ensure that meritorious claims of [ineffective assistance of trial counsel] receive review by at least one state or federal court." *Davila v. Davis*, 582 U.S. 521, 532 (2017) (citing *Martinez*, 566 U.S. at 10, 12). In other words, a petitioner cannot rely on *Martinez* to obtain review of a claim that was reviewed at the state trial court level of postconviction review and then not raised on postconviction appeal. *See id.*

A typical *Martinez* analysis therefore concerns the performance of attorneys at two stages—the trial stage, and the first level of the postconviction review stage. To determine if attorneys provided effective assistance at these stages, courts apply the familiar standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984). When deciding if an underlying trial counsel claim is "substantial," application of the *Strickland* standard "is not as stringent" as it would be "when considering the merits of the underlying claim." *Leeds*, 75 F.4th at 1017 (citing *Michaels v. Davis*, 51 F.4th 904, 930 (9th Cir. 2022)). But when deciding if postconviction counsel was ineffective, courts apply the *Strickland* standard "with full force." *Id.* at 1022 (citing *Claibourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014)).

### C. Ineffective Assistance of Counsel Claims

Under *Strickland*, a petitioner must show (1) deficient performance and (2) prejudice to the defendant. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (citing *Strickland*, 466 U.S. at 687). Counsel's performance is deficient where it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). Prejudice "is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

When a petitioner asserts that "ineffective assistance led to the improvident acceptance of a guilty plea," *Strickland*'s prejudice prong requires him "to show 'that there is a reasonable probability that, but for counsel's errors, [the petitioner] would not have pleaded guilty and would have insisted on going to trial.'" *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)). The Supreme Court has explained the heavy burden a petitioner bears in these circumstances:

> "Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), and the strong societal interest in finality has "special force with respect to convictions based on guilty pleas." *United States v. Timmreck*, 441 U.S. 780, 784 (1979). Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences.

*Lee v. United States*, 582 U.S. 357, 368–69 (2017). And when the proceeding in question is a sentencing hearing, a petitioner establishes *Strickland* prejudice by showing that "but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence." *Porter v. McCollum*, 558 U.S. 30, 41 (2009).

Finally, when a petitioner raises an exhausted claim of ineffective assistance in a federal habeas petition, "[t]he pivotal question" is not "whether defense counsel's performance fell below *Strickland*'s standard," but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). This amounts to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt*, 571 U.S. at 15 (quoting *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)).

## III. Discussion

### A. Claim 1C—Plea Bargaining

In Claim 1C, Coca asserts that he received ineffective assistance at the plea-bargaining stage because his counsel failed to investigate available defenses when Coca ran out of funding. (ECF No. 18 at 12–15.) Coca alleges that, despite paying a $100,000 retainer to an out-of-state attorney, counsel failed to adequately develop defenses,

including mental health defenses based on Coca's use of testosterone and a defense-of-others defense based on VanNatter shooting at Coca's son. (*Id.*) Coca acknowledges that he exhausted this claim during his first state postconviction proceeding (ECF No. 18 at 15 & n.59), so the Court reviews this claim under AEDPA's demanding standard for claims adjudicated on the merits in state court. And because this claim was adjudicated on the merits in state court, this Court's review is "based solely on the state-court record." *Shinn*, 596 U.S. at 378 (citing *Pinholster*, 563 U.S. at 180).

**i. Additional Background**

Early in the criminal case, the Justice Court admitted out-of-state counsel Mark Guralnick to represent Coca by associating with local counsel David Loreman. (ECF Nos. 34-12, 34-13.) Guralnick acted as lead counsel through the plea and sentencing.[5] At two hearings prior to Coca's guilty plea, Guralnick acknowledged the defense-of-others defense based on Coca's son. (*See* ECF No. 35-18 at 30 (identifying this as one possible defense, though it was "not [their] principal approach"); ECF No. 37-1 at 23–24 (noting Coca's son's presence at the scene of the shooting and stating "Mr. Coca has a lot to say about that, and I'm cautious about all of that").) Guralnick also filed a notice and supplemental disclosure regarding Coca's NGRI plea based on his testosterone treatments. (ECF No. 38-4; ECF No. 44-5 at 12–32.) And at another hearing, Guralnick discussed Dr. Piasecki's forthcoming NGRI report by stating that the defense team had received medical records relevant to the testosterone treatments from Dr. Smith and Dr. Moore. (ECF No. 39-5 at 47–50.) Dr. Piasecki produced a report finding that Coca was experiencing mental status changes at the time of the offenses induced by testosterone. (ECF No. 20-6 at 6–9.) The State's expert Dr. Henson produced a report with findings to the contrary. (ECF No. 45-8 at 58–67.)

[5] Guralnick filed motions to terminate Coca's solitary status (ECF No. 34-23), reduce bail (ECF Nos. 34-24, 36-4), change venue or declare Nevada's venue statutes unconstitutional or disqualify judges in the district (ECF Nos. 34-25, 36-2, 36-6, 36-7), suppress Coca's statements to police (ECF No. 36-1), and dismiss all charges based on an alleged *Brady* violation. (ECF No. 38-6.) Guralnick also filed a brief in support of the motion to suppress (ECF No. 38-3) and notices regarding Coca's NGRI plea. (ECF No. 38-4; ECF No. 44-5 at 12–32.) And Guralnick was lead counsel at the preliminary hearing (ECF Nos. 19-3, 19-4), status conferences (ECF Nos. 35-18, 37-1, 39-5, 39-6), and suppression hearing. (ECF No. 37-9, 37-10.)

It was in this context that Coca and the State negotiated a plea agreement. In the guilty plea agreement, Coca affirmed that he discussed the elements of the original charges against him with his attorney and that he understood the nature of the charges against him. (ECF No. 40-5 at 8.) Coca also affirmed that he discussed with his attorney any possible defenses and circumstances which might be in his favor. (*Id.* at 8.) At the plea cavass, the following exchange occurred between the state district court and Coca regarding the defense-of-others defense:

> The Court: Thank you. Also, one of the defenses that you're waiving in this case is the defense of others. Now, I know that you were concerned about the welfare of your son who was trying to come to your assistance at some point during the evening and may have fired the weapon in response to what you thought was his peril, but that no longer becomes a viable defense because you're entering a plea of guilty to seven of these charges. Do you understand that?
>
> The Defendant: Yes, sir.

(ECF No. 40-6 at 27–28.) Then, with respect to testosterone-based mental status defenses, the following exchange occurred between Guralnick, Coca, and the court:

> Mr. Guralnick: You're aware that earlier in this case, we filed a written notice of a plea of insanity, correct?
>
> The Defendant: Yes.
>
> Mr. Guralnick: And that notice was essentially advising the Court that we were going to explore the area of whether or not you experienced a chemical imbalance due to the ingestion of testosterone or other biochemical factors, right?
>
> The Defendant: Yes.
>
> Mr. Guralnick: And you realize that by pleading guilty, you're waiving your right to even present that defense to -- either as a defense to any of the charges or as an argument that it should diminish the sentence? You understand that?
>
> The Defendant: Yes, I do.
>
> The Court: Okay. In fact, you've been extensively examined by at least three professionals; is that true?
>
> The Defendant: Two I believe, yes.

(ECF No. 40-6 at 29.)

**ii. State Court Determination**

The Nevada Court of Appeals rejected this claim as follows:

> First, Coca claimed his counsel was ineffective for failing to pursue an insanity defense based upon his use of prescription testosterone. Coca appeared to assert he was unaware of this potential defense and would not have entered a guilty plea if such a defense had been pursued. Coca's claim was belied by the record. At the plea canvass, Coca specifically stated he was aware that his counsel had explored an insanity defense based upon his use of testosterone, his mental health had been evaluated on multiple occasions, he understood entry of a guilty plea waived an insanity defense, and he wished to enter a guilty plea. Given Coca's statements during the plea canvass, Coca failed to demonstrate his counsel's performance was deficient or a reasonable probability he would have refused to plead guilty and would have insisted on proceeding to trial had counsel further pursued this defense. Therefore, we conclude the district court did not err by denying this claim without conducting an evidentiary hearing.
>
> Second, Coca claimed his counsel was ineffective for failing to pursue a defense-of-others defense or retain ballistics experts. Coca did not explain how counsel's failure to perform these actions affected his decision to enter a guilty plea, and thus, he did not demonstrate a reasonable probability, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. Moreover, at the plea canvas Coca specifically acknowledged that he waived a defense-of-others defense by entry of his plea and still wished to enter a guilty plea despite that waiver. In addition, in the written plea agreement, Coc[a] acknowledged he had discussed possible defenses and circumstances that might be in his favor with his counsel, and wished to enter a guilty plea. Therefore, Coca failed to demonstrate his counsel's performance fell below an objective standard of reasonableness. We conclude the district court did not err by denying this claim without conducting an evidentiary hearing.

(ECF No. 46-24 at 3–4.)

**iii. Analysis**

The Nevada Court of Appeals' determination was not contrary to or an unreasonable application of clearly established federal law, and it was not based on an unreasonable determination of fact. The appellate court accurately cited Coca's affirmations in the guilty plea agreement and his testimony at the plea canvas in which Coca specifically acknowledged that he discussed possible defenses with counsel, including defense-of-others and testosterone-based mental health defenses. The

statements that Coca made in open court during the plea canvass "carry a strong presumption of verity." *Doe v. Woodford*, 508 F.3d 563, 571 (9th Cir. 2007) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).

Coca now alleges that counsel's investigation of these defenses was inadequate, and that this inadequate investigation was the result of "running out of funding." (ECF No. 18 at 23.) Coca supports this argument, in part, by quoting statements attributed to local counsel David Loreman frankly admitting to inadequate investigation prior to the plea and opining that lead counsel Mark Guralnick rendered ineffective assistance. (*See* ECF No. 92 at 22–23.) But the quotations attributed to Loreman are actually unverified second (or third) hand statements that appeared in postconviction counsel's reply brief in state court. There, postconviction counsel Tony Abbatangelo attributed certain statements to Loreman after stating that his "office spoke with David Loreman, Esq." (ECF No. 44-5 at 6.) The state district court noted Abbatangelo's attributions and gave Coca an opportunity to arrange for Loreman to verify and expand upon them by submitting an affidavit within 15 days. (ECF No. 45-6 at 5.) The court warned Coca that failure to submit an affidavit from Loreman would result in the court giving no weight to the statements attributed to Loreman. (*Id.*) Coca did not submit an affidavit from Loreman, and the state court rightly gave the attributions no weight. (*Id.* at 15–16.) As such, the unverified statements attributed to Loreman have no bearing on this Court's review of Claim 1C.

Moreover, regardless of any funding issues, it was reasonable for the appellate court to find that Guralnick was not deficient in his investigation of defenses based on Coca's testosterone use and defense of Coca's son prior to entry of the guilty plea. The record reflects that Guralnick discussed a defense-of-others defense with Coca and developed the testosterone defense by filing the NGRI notice and obtaining Dr. Piasecki's May 2012 NGRI report. The State's expert Dr. Hensen then produced a report with findings rebutting those of Piasecki.

The stage was set for this battle of the experts when, in October 2012, Coca faced the choice of either: A) testing the strength of these defenses before a jury, knowing that

guilty verdicts could leave him exposed to sentencing on seven counts of attempted murder with accompanying deadly-weapon enhancements, each of which carried up to 40 years in prison; or B) pleading guilty to one such count with six less severe counts of assault with a deadly weapon upon an officer performing their duty, which would significantly reduce his sentencing exposure. Although Coca now claims that he should have chosen option A, it was rational for Coca to choose option B and reap the benefit of reduced exposure at sentencing. *See Brady v. United States*, 397 U.S. 742, 752 (1970) (explaining that a “great many” guilty pleas are “motivated at least in part by the hope or assurance of a lesser penalty than might be imposed if there were a guilty verdict after a trial to judge or jury”). Therefore, applying appropriate deference to both the state court’s determination under AEDPA and counsel’s performance under *Strickland*, the Court denies relief for Claim 1C.

**B. Claims 1D and 3—Defense-of-Others and Restitution**

In Claim 1D, Coca asserts that counsel was ineffective for advising him he would not have a viable defense-of-others claim at trial. And in Claim 3, Coca asserts that counsel was ineffective for failing to object to the amount of restitution ordered by the court. The Court denies relief for these claims because Coca cannot overcome their procedural default.

Coca raised both claims in his *pro se* postconviction petition (ECF No. 42-33 at 11–12 (Claim 1D); ECF No. 42-33 at 13 (Claim 3)), and the state district court specifically addressed them when it denied postconviction relief. (ECF No. 45-9 at 10–11 (Claim 1D); ECF No. 45-9 at 11, 13 (Claim 3).) Coca’s postconviction counsel then had an opportunity to include these claims in his postconviction appeal brief, but he did not do so. (*See* ECF No. 46-15.) Because Coca defaulted these claims on postconviction appeal, he cannot rely on *Martinez* to obtain review of them. *See Davila*, 582 U.S. at 532. Coca’s unsuccessful presentation of these claims to the state court in his second postconviction petition does not alter this conclusion. *See Cone v. Bell*, 556 U.S. 449, 466–67 (2009) (“[W]hen a state court declines to revisit a claim it has already adjudicated, . . . ‘[that

decision] neither rests upon procedural default not lifts a pre-existing procedural default.'" (quoting *Ylst v. Nunnemaker*, 501 U.S. 797, 804 n.3 (1991))). Therefore, Coca has not shown the cause and prejudice required to overcome the procedural default of Claims 1D and 3, and they are not subject to further review.

**C. Claims 1A and 1B—Voluntary and Involuntary Intoxication**

In Claims 1A and 1B, respectively, Coca asserts that counsel was ineffective for failing to investigate the defenses of voluntary and involuntary intoxication. Although Coca arguably raised these claims in his *pro se* postconviction petition (*see* ECF No. 42-33 at 11), postconviction counsel did not specifically address the defenses of voluntary or involuntary intoxication in his reply. (*See* ECF No. 44-5 at 2–10.) And in its order denying postconviction relief, the state district court did not specifically address these defenses either, despite discussing Coca's testosterone-based mental health defense in general terms. (*See* ECF No. 45-9 at 8–10.) So the Court assumes that Coca may attempt to rely on *Martinez* to obtain review of these claims.

Coca alleges that he started prescribed testosterone treatments a few months before the offenses, which caused dramatic changes in his behavior and made him prone to paranoia and rage. (ECF No. 18 at 7–12.) Coca alleges that his behavior became so alarming that, just days before the offenses, he contacted his doctor and made an appointment to discuss the issue. (*Id.* at 9, 11.) Before Coca could attend the appointment, however, he committed the underlying offenses. (*Id.*) Coca alleges that these circumstances were consistent with viable defenses of voluntary and/or involuntary intoxication, that his counsel was ineffective for failing to investigate these defenses and inform Coca about them, and that he would not have pleaded guilty if he knew these defenses were available. (*Id.* at 7–12.) As explained below, even considering some of the evidence Coca presents in support of Claims 1A and 1B that was not part of a procedurally proper state court record, the Court denies these claims because they are not substantial under *Martinez*.

### i. Evidence to be Considered

In support of Claims 1A and 1B, Coca cites certain evidence that was not presented to the state court until his second postconviction proceeding. (ECF No. 65-46.) This evidence includes declarations from family and friends (ECF Nos. 19-1, 19-4, 19-5, 19-7, 19-9, 19-10), medical records (ECF Nos. 20-1, 20-2), and a psychiatric evaluation report completed by Dr. Erik Messamore in December 2021. (ECF No. 20-7.)

With narrow exceptions, 28 U.S.C. § 2254(e)(2) bars a federal habeas court from considering evidence in support of a claim where a petitioner has "failed to develop the factual basis of [the] claim in State court." § 2254(e)(2); *see McLaughlin v. Oliver*, 95 F.4th 1239, 1249 (9th Cir. 2024) ("Although § 2254(e)(2)'s language refers only to prohibiting 'an evidentiary hearing on [a] claim,' the Court in *Shinn* reaffirmed that the statute's restrictions also apply 'when a prisoner seeks relief based on new evidence without an evidentiary hearing.'" (quoting *Shinn*, 596 U.S. at 389)).

Coca's inclusion of this evidence with his second postconviction petition does not provide a basis to consider it on federal habeas review, as the Nevada Supreme Court rejected this petition as "procedurally barred." (ECF No. 65-46); *see McLaughlin*, 95 F.4th at 1249 (holding that "a failure to present evidence to the state courts 'in compliance with state procedural rules'" is the equivalent of failing to develop the factual basis under § 2254(e)(2) (quoting *Shinn*, 596 U.S. at 375–76)). And Coca does not attempt to argue that he can satisfy an exception of § 2254(e)(2). Instead, Coca argues that § 2254(e)(2) does not apply in this instance because he did not fail to develop the factual basis of these claims during his first postconviction proceeding in state court; it was the state district court that thwarted his diligent attempts to do so by denying his request for an evidentiary hearing. (*See* ECF No. 92 at 10–14.)

When deciding if a petitioner "failed to develop the factual basis" of claims such that § 2254(e)(2) applies, the term "fail" means "the prisoner must be 'at fault' for the undeveloped record in state court." *Williams v. Taylor*, 529 U.S. 420, 432, 434 (2000). Because the word "failed" suggests "some omission, fault, or negligence on the part of

the person who has failed to do something," a habeas petitioner has "failed to develop the factual basis of a claim," within the meaning of § 2254(e), only if "there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 431–32. When "[a]n indigent prisoner . . . is denied counsel and discovery[, he] has no practical likelihood of" investigating his post-conviction claims in state court. *Rodney v. Garrett*, 116 F.4th 947, 957 (9th Cir. 2024). In that situation, a petitioner has done "all that he could to develop the evidentiary bases of his . . . claims in state court," so he cannot be found to have "fail[ed] to develop the state-court record within the meaning of § 2254(e)(2)." *Id.*

Here, the state district court appointed counsel for Coca during his first postconviction proceedings, so it was the job of postconviction counsel to investigate the factual basis of Coca's claims regarding the defenses of voluntary and involuntary intoxication. Although postconviction counsel did not specifically mention these two defenses in the reply brief, the reply did discuss the effect of Coca's testosterone use on his culpable mental state and request discovery and an evidentiary hearing. (*See* ECF No. 44-5 at 3, 8–9.) The court denied those requests when it denied postconviction relief. (*See* ECF No. 45-9 at 17 ("[T]he Court can find no flaws in the handling of this case by the defense counsel which would call for even a hearing much less a judicial extinguishment of the plea and a reason for a new trial.").) In these circumstances, it is unclear if the failure to develop the factual bases for Claims 1A and 1B is attributable to postconviction counsel (and imputed to Coca) or the state court. The Court therefore assumes that § 2254(e)(2) does not apply to the evidence submitted in support of Claims 1A and 1B.

The Court notes, however, that some of this evidence either cannot be considered or adds no additional information to facts that already exist in the state court record. That is, three of the six declarations are not properly signed and/or dated and thus cannot be considered. (ECF No. 19-1 (incorrectly dated declaration of Peter James Coca)[6]; ECF

---

[6]Coca acknowledged the incorrect date and stated that he expected to submit a corrected declaration, but he did not do so. (*See* ECF No. 19 at 2 n.1.)

No. 19-4 (undated declaration of Derrick Montoya); ECF No. 19-5 (unsigned declaration of Eligio Montoya)); *see* 28 U.S.C. § 1746 (requiring unsworn declarations to be signed and dated); *Tobin v. City & Cnty. of S.F.*, 747 F.App'x 584, 585 (9th Cir. 2019) (affirming district court's exclusion of plaintiff's unsigned declaration, in part, because it was unsigned). And the newly presented medical records are not included in the state court record, but they were reviewed by Dr. Piasecki and discussed in the May 2012 NGRI report (ECF No. 20-6 at 6–7), so they add no additional relevant information. That leaves three declarations and Dr. Messamore's December 2021 psychiatric evaluation, which will be discussed as relevant below.

**ii. Voluntary Intoxication**

Turning to Claim 1A, Nevada law allows "voluntary intoxication . . . [to] be considered in determining intent." *Andrade v. State*, 483 P.2d 208, 208 (Nev. 1971); *see also* NRS § 193.220 ("No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his or her condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of the person's intoxication may be taken into consideration in determining the purpose, motive or intent."). Coca faced seven counts of attempted murder, each of which required the State to prove beyond a reasonable doubt that Coca had the specific intent to kill. (ECF No. 35-9.) Coca also faced seven alternative counts, six of which were specific intent crimes (the assault charges).[7] *See Powell v. State*, 934 P.2d 224, 227 (Nev. 1997). So as a legal matter, Coca's counsel could have targeted these specific-intent elements by pursuing a voluntary intoxication defense, and Coca is correct that the record does not contain any references to this particular defense by Coca's counsel.

[7] The alternative battery charge against VanNatter, however, was a general intent crime. *See Byars v. State*, 336 P.3d 939, 949 (Nev. 2014).

To support the argument that a voluntary intoxication defense was viable, Coca relies in part on the new evidence mentioned above[8]—Dr. Messamore's December 2021 psychiatric evaluation (ECF No. 20-7) and declarations from Coca's wife Tracie, his friend/employee Glynn Kelly, and his son Joshua. In Tracie's declaration, she states that Coca's testosterone use led to increased energy followed by drastic mood changes, and that he was irrational during the argument that precipitated the shootings. (ECF No. 19-7.) In Glynn's declaration, he states that he noticed drastic changes in Coca's behavior in the months before the shootings, and he attributes the mood swings and the shootings to Coca's testosterone use. (ECF No. 19-9.) And in Joshua's declaration, he states that Coca's personality changed after starting testosterone treatments. (ECF No. 19-10.)

The takeaway from these declarations—that people close to Coca could corroborate that Coca experienced mood shifts and increased irritability after beginning testosterone treatments—was well known to Coca's counsel prior to entry of the guilty plea. Indeed, Coca's counsel pursued a defense based on these facts by filing the NGRI plea and obtaining the NGRI report from Dr. Piasecki. And a successful NGRI defense would have been a "complete defense" to all of the charged criminal acts based on Coca's "inability to form the requisite criminal intent." *Finger v. State*, 27 P.3d 66, 80 (Nev. 2001).

In preparing her report, Dr. Piasecki met with Coca twice, spoke to Coca's wife Tracie, and reviewed Coca's medical records from Dr. Moore (who prescribed the testosterone) and Dr. Smith (who Coca called to book the appointment out of concern just before the shootings). (ECF No. 20-6 at 6–9.) Coca and his wife both gave accounts to Piasecki that were consistent with the newly offered declarations, in that they both reported Coca experiencing increased anger and irritability in the months before the shootings, and they both attributed these mood shifts to Coca's testosterone use. (*Id.* at 8–9.) Based on these reports and her review of other materials, Piasecki found that: 1) Coca "appear[ed] to have experienced mental status changes induced by testosterone";

[8] Coca also supports Claim 1A by referencing the unverified statements attributed to local counsel David Loreman by postconviction counsel Tony Abbatangelo (*see* ECF No. 92 at 18), but Coca did not substantiate these statements in state court after being given an opportunity to file an affidavit from Loreman, so this Court gives these statements no weight in its analysis.

2) these changes “in the weeks following onset of testosterone use aligns with a diagnosis of steroid-induced manic episode”; 3) Coca’s phone call to his doctor “one week prior to the shooting with concerns about ‘aggression’ indicates that Mr. Coca was aware of his increased irritability and it was causing him significant problems”; and 4) Coca’s thinking and behavior on the night of the shootings “are best understood as related to the mental status changes induced by testosterone injections.” (*Id.* at 9.)

Dr. Messamore’s psychiatric evaluation from December 2021 is consistent with Dr. Piasecki’s report. (*See* ECF No. 20-7 at 2–10.) Messamore reviewed many of the same materials as Piasecki, considered the resulting NGRI report, and took into account fresh declarations from friends and family and a December 2021 interview with Coca. (*Id.* at 2.) Messamore found that Coca “was in the midst of a severe episode of mania with psychosis” on the night of the shootings that was caused by the prescribed testosterone. (*Id.* at 3.) Messamore also agreed with Piasecki that the NGRI defense would have been viable, and he added his opinion that Coca did not form specific intent to murder the officers during the shooting. (*Id.*)

A few months after Dr. Piasecki’s NGRI report, the State’s expert Dr. Henson produced a report with findings that differed from Piasecki and Messamore. (*See* ECF No. 45-8 at 58–67.) Henson based his report on a review of discovery materials, records from the facility where Coca underwent a competency evaluation, the NGRI report, and interviews with Coca, Coca’s wife, and the State’s attorney. (*Id.* at 59–60.) In the report, Henson noted that Coca started using prescribed testosterone prior to the shootings and experienced improved mood and energy, followed by increased irritability and feelings of jealousy regarding the fidelity of his spouse. (*Id.* at 61.) Henson nonetheless concluded that, during the shootings, Coca was not delusional, he understood that police officers were present and acting within their authority, and he made a deliberate plan to fire the volley of shots that struck Deputy VanNatter after his son arrived on the scene and sustained fire. (*Id.* at 66–67.)

Coca's statements at the plea canvass reflect that he was fully informed of the differing expert opinions on the effect that his testosterone use had on his mental state, and he knowingly waived the right to present mental-health based testosterone defenses in exchange for a significant reduction in his sentencing exposure. Indeed, at the plea canvass, Coca agreed with Guralnick's broad description of the NGRI notice as "essentially advising the Court that we were going to explore the area of whether or not you experienced a chemical imbalance due to the ingestion of testosterone or other biochemical factors." (ECF No. 40-6 at 29.) And Coca agreed that, by pleading guilty, he was "waiving [his] right to ever present that defense." (*Id.*)

As noted above, "[c]ourts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies" and "should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee*, 582 U.S. at 369. Here, Coca has not established that his decision to plead guilty would have been different if counsel had centered the testosterone defense around voluntary intoxication rather than insanity. Therefore, Claim 1A is not a substantial claim of ineffective assistance of counsel, and it is procedurally barred from federal review.

**iii. Involuntary Intoxication**

Claim 1B, pertaining to involuntary intoxication, is not a substantial claim of ineffective assistance of counsel for essentially the same reasons as Claim 1A. That is, the record reflects that Coca's counsel adequately investigated and pursued a mental-health testosterone defense, and Coca has not established that his decision to plead guilty would have been different if counsel had specifically focused that defense on involuntary intoxication.

Moreover, in Nevada, the defense of involuntary intoxication requires a defendant to prove three elements, including that "he was compelled to take the intoxicating substance against his will either through force, duress, fraud, or contrivance." *Grey v. State*, 178 P.3d 154, 122 n.22 (Nev. 2008). Coca alleges that his doctor caused him to

take prescribed testosterone treatment against his will because his doctor did not warn him about the possible side effects. (ECF No. 18 at 11.) But Coca does not attempt to explain what it would take to prove a defense of involuntary intoxication by medication under Nevada law. The Courts notes that, in the context of a criminal conviction for driving under the influence of controlled substances or chemicals, the Nevada Supreme Court has acknowledged the possibility of involuntary intoxication by medication for a "defendant who has taken prescribed drugs with severe unanticipated effects." *Whisler v. State*, 116 P.3d 59, 62 (Nev. 2005) (quoting *Commonwealth v. Wallace*, 439 N.E.2d 848, 850 (Mass. App. Ct. 1982)). But the Nevada Supreme Court also described this defense as requiring the defendant to argue "that he did not know he was intoxicated or impaired." *Id.* at 64. And Coca's allegation that he called his doctor to schedule an appointment out of concern for behavioral changes after starting testosterone treatment cuts against that requirement.

Because Coca has not demonstrated the cause and prejudice necessary to excuse the procedural default of Claim 1B, this claim is not subject to further review.

**D. Claim 2—Racial Animus at Sentencing**

Finally, in Claim 2, Coca alleges that the state district court made race-based assumptions about Coca's motivations for committing the offenses, which violated his due process rights. (ECF No. 18 at 17–19.) Coca also alleges that counsel was ineffective for failing to object on this basis at the sentencing hearing, and that Coca would have received a more lenient sentence if counsel had made it clear that Coca's ethnicity could not be used against him. (*Id.*)

Coca acknowledges that this claim is procedurally defaulted (*id.* at 19), and having reviewed the parties' briefing on this issue, the Court finds that Coca has established cause and prejudice to excuse the default of this claim under *Martinez* because the underlying claim of ineffective assistance has some merit, and because postconviction counsel was arguably ineffective for failing to raise it during Coca's first postconviction proceeding. *See Ruvalcaba v. State*, 143 P.3d 468, 470 (Nev. 2006) ("A trial judge may

not . . . consider a defendant's nationality or ethnicity in its sentence determination; consideration of these facts violates a defendant's right to due process." (quoting *Martinez v. State*, 961 P.2d 143, 145 (Nev. 1998))); *Michaels*, 51 F.4th at 935 ("A failure to recognize a potentially viable IAC claim is not a strategic decision."). On *de novo* review, however, the Court denies this claim because Coca has not established a reasonable probability that he would have received a different sentence if his counsel had raised the requested objection. The Court nonetheless grants a certificate of appealability for this claim, as reasonable jurists could debate this resolution.

**i. Additional Background**

At the beginning of the sentencing hearing, the state district court informed the parties that it had read the presentence investigation (PSI) report several times and was particularly interested in hearing testimony on a few matters: the timing of the shootings (how long the first exchange lasted, how long after Coca's son arrived on the scene until Coca shot VanNatter, and how much time elapsed before Coca shot at the final two officers in a different location); the emotional impact of the incident on VanNatter and his family; the contention that Coca's behavior was out of character; and Coca's past (his prior DUI, how his brother died, what was the nature of the dispute with an employee on the morning of the offenses, and his childhood). (ECF No. 41-1 at 5–7.) The State then presented testimony from five of the seven officers involved in the shootings. (*Id.* at 13–67.) Each of these witnesses testified regarding the timing of the shootings and the physical and mental toll of the incident, with VanNatter testifying in detail about the severity of his injuries after Coca hit him with six shots. (*See id.* at 59–65.)

Coca's counsel then presented testimony from nine individuals in support of Coca: a friend/employee, a neighbor, a family friend, his stepmother, his mother, two of his sons, his wife, and Coca himself. (*Id.* at 69–174.) These individuals addressed Coca's past and corroborated that Coca's behavior during the incident was entirely out of character. Coca and his wife also testified that Coca's testosterone treatments in the months leading to the incident made him more aggressive, and that Coca was so concerned that he made

a doctor's appointment just before the shootings occurred. (*Id.* at 128–29, 132 (Coca's wife); *id.* at 157–58, 160–65 (Coca).) Following the witness testimony, Coca's counsel read into the record a portion of the findings from Dr. Piasecki's NGRI report, including that Coca "appears to have experienced mental status changes induced by testosterone" at the time of the offenses that "aligns with a diagnosis of steroid-induced manic episode." (*Id.* at 174–75.) The state district court then noted that it had also read the competing report prepared by the State's expert, Dr. Henson. (*Id.* at 176.)

Claim 2 refers to the state district court's questioning of Coca's mother, Lillian. On direct, after Lillian testified regarding Coca's upbringing and character, the following exchange occurred between the court and Lillian:

> The Court: Could you share with me, please, your cultural or ethnic heritage. Where did your ancestors live?
>
> The Witness: New Mexico.
>
> The Court: In New Mexico?
>
> The Witness: Yes.
>
> The Court: And how far back does that go?
>
> The Witness: I was born in Espanola, New Mexico, and then I went to school to Albuquerque, New Mexico.
>
> The Court: And do you also speak Spanish?
>
> The Witness: Oh, yeah, I sure do.
>
> The Court: Thank you. I'm sorry, go ahead.

(*Id.* at 107–08.) Coca's counsel then asked Lillian a few more questions and passed the witness. During cross-examination, after the State asked its questions, a second exchange occurred between the court and Lillian:

> The Court: Mrs. Coca, I have a difficult question for you, but I -- that kind of cuts in two directions, but I want to ask you.
>
> It has been my experience that in the Hispanic-American community, that existence or claims of infidelity contain a heightened indignation. They're

considered, on both the man and woman's side, to be something that produces great rage. I've just seen it for 35 years now.

Do you know anything about how your family felt about those kinds of things?

The Witness: Well, first of all, could I correct you about this Hispanic thing?

The Court: Sure.

The Witness: We're Mexican-American.

The Court: Proud of it, it sounds like, too, correct?

The Witness: Yes, yes, we are.

The Court: Good, okay. I thought you said you came from New Mexico.

The Witness: I am from New Mexico.

The Court: Okay.

The Witness: They are Mexican-Americans, you know.

The Court: All right, thank you for correcting me.

But my question, maybe even more so, is whether or not the Mexican-American community that you grew up in, there was this heightened sense of, let's see, disrespect when there were claims of infidelity?

The Witness: Are you talking about how I grew up?

The Court: Yeah.

The Witness: Things like that?

The Court Yeah.

The Witness: My grandmother raised us because we didn't know what happened to my mother. I was nine years old, and my younger sister was like almost two, and we were five of us. My mom took Rosy, one. And my dad, he was a womanizer. Never saw him probably -- who knows. Then my grandparents died. So I had uncle that took over my sister, and the other uncles took over my other sisters. And I ended up in the orphanage.

And after that, I ran away from the orphanage, and I just became homeless, sleeping where I could. And then the D.A. finally found out where my mother

> was, and I was like 16 and a half, and she went and got us. So I was in Ely before I was 17.
>
> The Court: Thank you.
>
> The Witness: You're welcome.

(*Id.* at 110–12.)

After all witness testimony, the State's attorney requested that Coca receive the maximum penalties on each count and to have those sentences run consecutively (*id.* at 182–83), which would have been a total of 30 to 76 years' imprisonment. (ECF No. 40-6 at 14–18.) Coca's counsel requested that Coca (who was 45 at the time) receive concurrent sentences that would make him eligible for parole in his early 50s. (ECF No. 41-1 at 194.) The court sentenced Coca to 20 to 52 years' imprisonment—lower than the State's requested sentence, but higher than the request of Coca's counsel. (ECF No. 42-24 at 14; ECF No. 42-28.)

The court explained its reasoning for the sentence imposed, including that it acknowledged "some influence from the steroid ingestion mentioned by Dr. Piasecki," but it "just [didn't] buy her argument that that somehow allows a foreign intelligence to invade an otherwise sweet and compassionate man and cause him to do things that his character is unable to do without that kind of foreign substance in his body." (ECF No. 41-1 at 199.) As mitigating factors, the court found that Coca was genuinely remorseful, that this incident was atypical for his character, and that Coca and his family should have some hope for reconnection later in life. (*Id.* at 202–04, 208.) However, the court also found that VanNatter sustained very serious injuries, that each officer was placed in danger that night, and that the incident consisted of three separate segments that should each carry a separate consecutive sentence (the initial exchange of fire, the shooting of VanNatter, and the subsequent firing at two officers in a different location). (*Id.* at 198–200; ECF No. 42-24 at 4–12.)[9]

[9] The court stated its sentencing rationale at the initial sentencing hearing (ECF No. 41-1 at 197–209) and a follow-up hearing to clarify the sentence. (ECF No. 42-24.)

ii. **Analysis**

To restate, Coca alleges that counsel should have objected when the state district court asked his mother, Lillian, questions framed around the court's stated impression that real or perceived infidelity produces heightened indignation or rage in the "Hispanic-American" or "Mexican-American community." Based on this line of questioning, Coca alleges that the court used Coca's race to assume that the shootings were caused by Coca's rage at his wife's perceived infidelity, rather than credit the evidence and testimony supporting the position that the shootings were caused by Coca's testosterone use. (ECF No. 18 at 17–19; ECF No. 92 at 25–33.) And Coca alleges that, if his counsel had objected and made it clear that Coca's ethnicity could not be used against him, then Coca would have received a more lenient sentence. (*Id.*)

At the outset, the Court finds that the state district court's questioning of Lillian was clearly improper. It is a violation of due process under Nevada law for a trial judge to "consider a defendant's nationality or ethnicity in its sentence determination." *See Ruvalcaba*, 143 P.3d at 470. And in the same way that "[i]t would be patently unconstitutional for a State to argue that a defendant is liable to be a future danger because of his race," it is unconstitutional to assume that a defendant's race was the cause of his past conduct. *See Buck v. Davis*, 580 U.S. 100, 119 (2017). To be clear, there was no doubt in the record that Coca's feeling immediately precipitating the shooting was rage at his wife's perceived infidelity, but the cause of that rage was debated at the sentencing hearing, and Coca's counsel argued that the rage was attributable to Coca's testosterone use rather than other factors. By questioning Lillian as it did, the state district court raised the possibility that one of those other factors may have been Coca's race. That was wrong, and a competent defense attorney would have objected to ensure that the state district court refrained from considering Coca's race in its sentence determination. *See Buck*, 580 U.S. at 119.

To establish prejudice, however, Coca must show that "but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence."

*Porter*, 558 U.S. at 41. “The likelihood of a different result must be substantial, not just conceivable.” *Harrington*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693.) Here, while the state district court’s questioning of Lillian was improper, her responses to those questions provided a counterweight to the assumptions expressed in the questions themselves. That is, when the court asked Lillian whether her family had the same beliefs regarding infidelity that the court assumed to exist within “the Hispanic-American community,” Lillian rejected the premise of the question by clarifying that her family was “Mexican-American.” (*See* ECF No. 41-1 at 110–11.) And when the court accepted that clarification but essentially repeated its question by substituting “the Mexican-American community,” Lillian responded by briefly describing her childhood without addressing her family’s or community’s views on infidelity. (*Id.* at 111–12.) The court simply responded “[t]hank you” (*id.* at 112), and the hearing continued without any further reference to race or ethnicity by the court.

Moreover, when the state district court explained its reasoning for imposing sentence, it did not ignore Coca’s testosterone use altogether; instead, it noted Dr. Piasecki’s opinion and found that testosterone had “some influence” on Coca’s behavior that night. (*Id.* at 199.) However, the court did not consider that influence to be so great that it caused Coca to act in a way that he was otherwise incapable of acting. (*See id.*) That finding was consistent with the report of the State’s expert witness Dr. Henson, which the court acknowledged having read during the sentencing hearing. (*See id.* at 176–77.) Henson reviewed discovery materials, medical records from the facility where Coca underwent a competency evaluation, and Dr. Piasecki’s NGRI report. (ECF No. 45-8 at 59.) Henson also interviewed Coca, Coca’s wife, and the State’s attorney. (*Id.* at 59–60.) In his report, Henson noted that Coca’s use of prescription testosterone coincided with increased irritability and feelings of jealousy regarding the fidelity of his spouse. (*Id.* at 61.) Henson nonetheless concluded that, during the shootings, Coca was not delusional and he was not just angry with the perceived infidelity of his spouse, but also experiencing growing pressure with his business, finances, and children. (*Id.* at 66–67.)

In sum, given Lillian's responses to the state district court's questions, the state district court's lack of any other references to Coca's race or ethnicity before or after the questions to Lillian, the other testimony and evidence considered at the sentencing hearing (including Dr. Henson's expert report), and the state district court's thorough explanation of its sentencing rationale, there is an insufficient basis for this Court to find that the state district court ultimately considered Coca's race in its sentencing determination. *See Strickland*, 466 U.S. at 695 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision."). The Court therefore finds that Coca has failed to demonstrate a reasonable probability that he would have received a different sentence if counsel had objected during the state district court's questioning of Lillian. Claim 2 is denied.

**E. Request for an Evidentiary Hearing**

As a component of his request for relief, Coca asks the Court to hold an evidentiary hearing. (ECF No. 18 at 20.) Except for Claim 2, all of Coca's claims either fail on the merits under AEDPA review (Claim 1C) or are procedurally defaulted without a sufficient showing of cause and prejudice under *Martinez* (Claims 1A, 1B, 1D, and 3). An evidentiary hearing is not warranted on such claims. *See Shinn*, 596 U.S. at 378 (explaining that a federal habeas court may review exhausted claims "based solely on the state-court record (citing *Pinholster*, 563 U.S. at 180)); *id.* at 382 ("[U]nder § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel."). As for Claim 2, although the Court has found that Coca made a sufficient showing of cause and prejudice to obtain review on the merits, the Court has determined that Coca is not entitled to relief, and further factual development would not affect the Court's reasons for denying relief. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record . . . otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). Coca's request for an evidentiary hearing is denied.

## IV. Certificate of Appealability

This is a final order adverse to Coca, so Coca cannot appeal without a certificate of appealability (COA). Rule 11(a) of the Rules Governing Section 2254 Cases. A COA requires "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate whether (1) the petition states a valid claim of the denial of a constitutional right and (2) this Court's procedural ruling was correct. *Id.*

The COA standard is not high. Coca must only "sho[w] that reasonable jurists could debate the district court's resolution or that the issues are adequate to deserve encouragement to proceed further." *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc) (internal citations and punctuation omitted). Having reviewed its determinations and rulings in adjudicating Coca's petition, the Court concludes that the *Slack* standard is met with respect to its resolution of Claim 2, above. *See Leeds*, 75 F.4th at 1018 (explaining that the standard for finding a claim to be "substantial" under *Martinez* is analogous to the standard for granting a COA (citing *Martinez*, 566 U.S. at 14)). The Court therefore grants a certificate of appealability as to that claim. The Court declines to issue a certificate of appealability for its resolution of Coca's other claims.

## V. Conclusion

IT IS THEREFORE ORDERED that Petitioner Peter Mark Coca's first amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 **(ECF No. 18) is DENIED**.

IT IS FURTHER ORDERED that a certificate of appealability is **GRANTED** on Claim 2, asserting that trial counsel was ineffective for failing to object to the sentencing court's expression of racial animus during sentencing.

IT IS FURTHER ORDERED that a certificate of appealability is otherwise **DENIED**.

The Clerk of Court is kindly **DIRECTED** to substitute Nethanjah Breitenbach for Respondent "Warden Brian Williams," enter judgment accordingly, and close this case.

DATED: November 20, 2026.

KENT J. DAWSON
UNITED STATES DISTRICT JUDGE